UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
No. 4:15-CV-00191-FL

**Creo Waverly Merritt III**,

          Plaintiff,

v.

**Carolyn W. Colvin**, Acting
Commissioner of Social Security

          Defendant.

**Memorandum & Recommendation**

Plaintiff Creo Waverly Merritt III instituted this action on December 3, 2015, to challenge the denial of his application for social security income. Merritt claims that Administrative Law Judge Edward W. Seery erred in his determination by (1) failing to find that his impairments meet or medically equal Listings 12.04 and 12.06; (2) finding that he has the residual functional capacity ("RFC") to perform a reduced range of medium work; and (3) failing to assign controlling weight to a treating certified nurse practitioner's medical opinion. Both Merritt and Defendant Carolyn Colvin, the Acting Commissioner of Social Security, have filed motions seeking a judgment on the pleadings in their favor. D.E. 15, 17.

After reviewing the parties' arguments, the court has determined that ALJ Seery's RFC analysis and his explanation for the weight given to the opinion of Merritt's treating certified nurse practitioner preclude meaningful review. Therefore, the undersigned magistrate judge recommends[1] that the district court grant Merritt's Motion for Judgment on the Pleadings be

---

[1] The court has referred this matter to the undersigned magistrate judge for entry of a Memorandum and Recommendation. 28 U.S.C. § 636(b).

granted, deny Colvin's Motion for Judgment on the Pleadings, and remand this matter for further proceedings.

**I.    Background**

On September 17, 2012, Merritt filed an application for disability insurance benefits on the basis of a disability that allegedly began on January 1, 2011. After his claims were denied at both the initial stage and upon reconsideration, Merritt appeared before ALJ Seery for a hearing to determine whether he was entitled to benefits.  ALJ Seery ultimately determined Merritt was not entitled to benefits because he was not disabled.  Tr. at 24, D.E. 12.

ALJ Seery found that Merritt had the following severe impairments: depression, attention deficit hyperactivity disorder, anxiety, and a history of atrial fibrillation. *Id.* at 17. However, ALJ Seery determined that Merritt's impairments, alone or in combination, did not meet or equal a Listing impairment. *Id.* at 17–19. Based on his examination of the record, ALJ Seery concluded that Merritt had the RFC to perform less than a full range of medium work in that he could occasionally lift, carry, push, and pull up to 50 pounds; frequently lift, carry, push, and pull up to 25 pounds; sit, stand, and walk up to six hours in an eight-hour workday; and perform simple, routine, repetitive tasks with occasional interaction with co-workers and supervisors. *Id.* at 19. ALJ Seery also concluded that Merritt should avoid concentrated hazards. *Id.* He then found that Merritt was unable to perform any past relevant work but that, considering his age, education, work experience and RFC, there were other jobs that existed in the national economy that he was capable of performing. *Id.* at 23–24. These included: kitchen helper, hand packager, and supply worker. *Id.* at 24.  Thus, ALJ Seery concluded that Merritt was not disabled. *Id.*

After unsuccessfully seeking review by the Appeals Council, Merritt commenced this action. D.E. 1.

**II.     Analysis**

   **A.     Standard for Review of the Acting Commissioner's Final Decision**

When a social security claimant appeals a final decision of the Commissioner, the district court's review is limited to the determination of whether, based on the entire administrative record, there is substantial evidence to support the Commissioner's findings. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Substantial evidence is defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). If the Commissioner's decision is supported by such evidence, it must be affirmed. *Smith v. Chater*, 99 F.3d 635, 638 (4th Cir. 1996).

   **B.     Standard for Evaluating Disability**

In making a disability determination, the ALJ engages in a five-step evaluation process. 20 C.F.R. § 404.1520; *see Johnson v. Barnhart*, 434 F.3d 650, 653 & n.1 (4th Cir. 2005). The analysis requires the ALJ to consider the following enumerated factors sequentially. At step one, if the claimant is currently engaged in substantial gainful activity, the claim is denied. At step two, the claim is denied if the claimant does not have a severe impairment or combination of impairments significantly limiting him or her from performing basic work activities. At step three, the claimant's impairment is compared to those in the Listing of Impairments. *See* 20 C.F.R. Part 404, Subpart P, App. 1. If the impairment is listed in the Listing of Impairments or if it is equivalent to a listed impairment, disability is conclusively presumed. However, if the claimant's impairment does not meet or equal a listed impairment, the ALJ assesses the claimant's RFC to determine, at step four, whether he can perform his past work despite his impairments. If the claimant cannot perform past relevant work, the analysis moves on to step

five: establishing whether the claimant, based on his age, work experience, and RFC can perform other substantial gainful work. The burden of proof is on the claimant for the first four steps of this inquiry, but shifts to the Commissioner at the fifth step. *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995).

### C. Medical Background

Merritt suffers from depression, attention deficit hyperactivity disorder ("ADHD"), and a history of atrial fibrillation. He also suffers from bipolar disorder, PTSD, and sleep apnea.

In 2012, Dr. Christiano at Vidant Cardiology diagnosed Merritt with pericardial thickening and questionable pericardial constriction, and recommended that he undergo right and left cardiac catheterization. Tr. at 327, D.E. 13. On August 28, 2012, Dr. Christiano performed left heart catheterization, coronary angiography, and right heart catheterization with oxygen saturation run on Merritt. *Id.* at 332. Approximately one month later, Merritt underwent electrophysiology study, atrial fibrillation ablation, left heart catheterization, and trans-septa procedure for atrial fibrillation. *Id.* at 338. The surgeon, Dr. David Frazier, noted that Merritt had "an enlarged left atrium with markedly enlarged left superior and right superior pulmonary veins with frequent episodes of atrial fibrillation and flutter" and "very dense pericardial calcification." *Id.* at 367.

Merritt also sought care from various mental health care providers at ECU Physicians. In March 2012, a provider noted that Merritt was doing well and was stable on his medications. *Id.* at 384. The provider then continued Merritt's prescriptions of Cymbalta and Abilify for depression, Ambien for insomnia, and Vyvanse for ADHD. *Id.* at 386. Merritt followed-up in June, denying depression and anhedonia. *Id.* at 381. He also reported good sleep, energy, appetite, and concentration. *Id.* A provider switched Merritt's prescription for insomnia from

4

Ambien to Trazodone, prescribed him Klonopin for anxiety, and continued his prescriptions for Cymbalta and Abilify. *Id.*

In September 2012, a provider at ECU Physicians noted that Merritt had some anhedonia but still enjoyed cooking many different dishes and using his pilot's license to fly airplanes. *Id.* at 377. The provider continued Merritt's medications. *Id.* Merritt followed-up approximately one month later and a provider opined that he had anhedonia. *Id.* at 446. The provider switched Merritt's ADHD medication from Vyvanse to Concerta and increased his Abilify dosage. *Id.* One month later, Merritt again reported anhedonia and a provider switched his antidepressant from Cymbalta to Viibryd and switched his ADHD medication back to Vyvanse. *Id.* at 442–43.

In January 2013, Merritt reported that his mood and anxiety were worsening and that he had stopped taking Trazodone. *Id.* at 436. Providers increased his Abilify and Klonopin dosages, continued his other medications, and re-prescribed him Trazodone. *Id.* at 438.

Merritt then transferred his care to Wilson Psychiatric Associates. In March 2013, he reported that he was depressed and had decreased interest, energy, and motivation. *Id.* at 403. He also stated that he wanted to reduce his Abilify dosage and that he had already decreased the dose himself. *Id.* Elizabeth Hutchins, a psychiatric-mental health nurse practitioner, switched his antidepressant from Viibryd to Pristiq, decreased his Abilify dosage, discontinued Trazodone, and continued his other medications. *Id.* at 404. Later that month, Merritt sought care for worsening depression and anxiety. *Id.* at 400. He asserted that he wanted to discontinue Pristiq and Vyvanse due to their cost. *Id.* Ms. Hutchins prescribed him Prozac for his depression and Adderall for his ADHD, discontinued Pristiq and Vyvanse, and continued his other medications. *Id.* Merritt followed-up in May, reporting that he was not depressed, that he had anxiety due to

5

financial problems, and that his Adderall was not lasting long enough. *Id.* at 398. Ms. Hutchins increased his dosage for Adderall and continued his other medications.

In September 2013, Merritt stated that he was becoming more depressed and that he was unable to leave his house. *Id.* at 429. He reported that his depression was a ten out of ten on a ten-point scale, that his anxiety was an eight out of ten on a ten-point scale, and that he had not been taking Abilify because he did not have health insurance. *Id.* Ms. Hutchins gave him samples of Abilify, increased his Prozac and Klonopin dosages, and continued his other medications. *Id.* at 431. Merritt returned later that month, reporting that his depression and anxiety were slightly better and that he was making himself leave his house. *Id.* at 426. He again stated that he had not been taking Abilify due to its cost. *Id.* Ms. Hutchins gave him samples of Abilify, increased his Prozac dosage, and continued his other medications. *Id.* at 428. Merritt followed-up in October, asserting that his depression and anxiety were slightly better, but that he still felt hopeless and had crying spells. *Id.* at 423. Ms. Hutchins increased his Abilify dosage, prescribed him Trazodone for insomnia, and continued his other medications. *Id.* at 425.

Merritt returned to Wilson Psychiatric Associates in December 2013 after visiting his daughter in Boston for two weeks. *Id.* at 420. He reported that his depression was worse and that he had stopped taking Abilify for a couple of weeks because he ran out. *Id.* Ms. Hutchins continued his medications and gave him samples of Abilify. *Id.* at 422. Merritt followed-up three months later, in March 2014, stating that he had experienced a hypomanic episode for three days and that he had stopped taking Abilify for a couple of months. *Id.* at 432. Ms. Hutchins gave him samples of Abilify and continued his other medications. *Id.* at 434.

6

financial problems, and that his Adderall was not lasting long enough. *Id.* at 398. Ms. Hutchins increased his dosage for Adderall and continued his other medications.

In September 2013, Merritt stated that he was becoming more depressed and that he was unable to leave his house. *Id.* at 429. He reported that his depression was a ten out of ten on a ten-point scale, that his anxiety was an eight out of ten on a ten-point scale, and that he had not been taking Abilify because he did not have health insurance. *Id.* Ms. Hutchins gave him samples of Abilify, increased his Prozac and Klonopin dosages, and continued his other medications. *Id.* at 431. Merritt returned later that month, reporting that his depression and anxiety were slightly better and that he was making himself leave his house. *Id.* at 426. He again stated that he had not been taking Abilify due to its cost. *Id.* Ms. Hutchins gave him samples of Abilify, increased his Prozac dosage, and continued his other medications. *Id.* at 428. Merritt followed-up in October, asserting that his depression and anxiety were slightly better, but that he still felt hopeless and had crying spells. *Id.* at 423. Ms. Hutchins increased his Abilify dosage, prescribed him Trazodone for insomnia, and continued his other medications. *Id.* at 425.

Merritt returned to Wilson Psychiatric Associates in December 2013 after visiting his daughter in Boston for two weeks. *Id.* at 420. He reported that his depression was worse and that he had stopped taking Abilify for a couple of weeks because he ran out. *Id.* Ms. Hutchins continued his medications and gave him samples of Abilify. *Id.* at 422. Merritt followed-up three months later, in March 2014, stating that he had experienced a hypomanic episode for three days and that he had stopped taking Abilify for a couple of months. *Id.* at 432. Ms. Hutchins gave him samples of Abilify and continued his other medications. *Id.* at 434.

### D.     Listings 12.04 and 12.06

Merritt argues that ALJ Seery erred by failing to find that his mental impairments are sufficiently severe to meet or medically equal Listings 12.04 and 12.06. Specifically, he contends that his mental impairments meets the criteria for these Listings because they have have affected his sleep, energy levels, and concentration. He avers that he has extended periods when he cannot leave the house or get out of bed. Colvin asserts that ALJ Seery did not err and that substantial evidence supports his decision. While acknowledging that Merritt suffers from mental impairments, the Commissioner points out that the resulting limitations were not found to be sufficiently severe so as to meet or equal the criteria for Listing 12.04 or 12.06. After review, the court concludes that ALJ Seery did not err in his decision on this point.

#### 1.     Overview of Listing of Impairments

The Listing of Impairments details impairments that are "severe enough to prevent an individual from doing any gainful activity." 20 C.F.R. § 416.925(a). If a claimant's impairments meet all the criteria of a particular listing, *id.* § 416.925(c)(3), or are medically equivalent to a listing, *id.* § 416.926, the claimant is considered disabled, *id.* § 416.920(d). "The Secretary explicitly has set the medical criteria defining the listed impairments at a higher level of severity than the statutory standard [for disability more generally]. The listings define impairments that would prevent an adult, regardless of his age, education, or work experience, from performing any gainful activity, not just 'substantial gainful activity.'" *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990); *see also Bowen v. Yuckert*, 482 U.S. 137, 153 (1987) (stating that the listings are designed to weed out only those claimants "whose medical impairments are so severe that it is likely they would be disabled regardless of their vocational background").

The claimant has the burden of demonstrating that his or her impairments meet or medically equal a listed impairment. *Hall v. Harris*, 658 F.2d 260, 264 (4th Cir. 1981); *see also Hancock v. Astrue*, 667 F.3d 470, 476 (4th Cir. 2012). As a result, a claimant must present medical findings equal in severity to all the criteria for that listing: "[a]n impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan*, 493 U.S. at 530–31; *see also* 20 C.F.R. § 416.925(c)(3). A diagnosis of a particular condition, by itself, is insufficient to establish that a claimant satisfies a listing's criteria. 20 C.F.R. § 416.925(d); *see also Mecimore v. Astrue*, No. 5:10–CV–64, 2010 WL 7281096, at *5 (W.D.N.C. Dec. 10, 2010) ("Diagnosis of a particular condition or recognition of certain symptoms do not establish disability.").

An ALJ is not required to explicitly identify and discuss every possible listing that may apply to a particular claimant. Instead, the ALJ must provide a coherent basis for his step three determination, particularly where the "medical record includes a fair amount of evidence" that a claimant's impairment meets a disability listing. *Radford v. Colvin*, 734 F.3d 288, 295 (4th Cir. 2013). Where such evidence exists but is rejected without discussion, "insufficient legal analysis makes it impossible for a reviewing court to evaluate whether substantial evidence supports the ALJ's findings." *Id.* (citing *Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986)). In reviewing the ALJ's analysis, it is possible that even "[a] cursory explanation" at step three may prove "satisfactory so long as the decision as a whole demonstrates that the ALJ considered the relevant evidence of record and there is substantial evidence to support the conclusion." *Meador v. Colvin*, No. 7:13–CV–214, 2015 WL 1477894, at *3 (W.D. Va. Mar. 27, 2015) (citing *Smith v. Astrue*, 457 F. App'x 326, 328 (4th Cir. 2011)). Nevertheless, the ALJ's decision must include

8

"a sufficient discussion of the evidence and explanation of its reasoning such that meaningful judicial review is possible." *Id.*

### 2. Listings 12.04 and 12.06

ALJ Seery found that Merritt's impairments did not meet or medically equal Listing 12.04 "Affective Disorders" or Listing 12.06 "Anxiety Related Disorders." Tr. at 22, D.E. 12. More specifically, ALJ Seery found that Merritt did not meet the paragraph "B" criteria or the paragraph "C" criteria of either Listing. *Id.* A claimant meets or medically equals Listing 12.04 or Listing 12.06 if he exhibits the criteria in Paragraph A and Paragraph B, or the criteria in Paragraph C. 20 C.F.R. Part 404, Subpt. P, App. 1, §§ 12.04, 12.06.

#### a. Paragraph "B" Criteria

The paragraph "B" criteria for Listing 12.04 and Listing 12.06 are the same: the claimant must have at least two of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social function; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration. *Id.* Episodes of decompensation "may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two)." *Id.* § 12.00(C)(4). They may also "be inferred from the medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system …; or other relevant information … about the existence, severity, and duration of the episode." *Id.* An episode of decompensation is of extended duration when it lasts for at least two weeks. *Id*. In this context, "repeated episodes" has been interpreted as occurring three times a year, or an average of once every four months. *Id.*

9

ALJ Seery concluded that Merritt had mild restriction in activities of daily living; moderate difficulties in social functioning; moderate difficulties in concentration, persistence, or pace. Tr. at 18, D.E. 12. He also found that Merritt had no extended episodes of decompensation. *Id*. In so finding, ALJ Seery noted that there was no evidence that Merritt was unable to care for his own personal care needs and no evidence of extended episodes of decompensation. *Id.* Additionally, ALJ Seery remarked that the record indicated that Merritt enjoyed cooking a variety of dishes, enjoyed spending time with his friends at cigar shops and smoking, had good concentration, and had mental status examinations that were consistently within normal limits. *Id.*

ALJ Seery's conclusions are supported by substantial evidence in the record. Healthcare providers described Merritt as being well-groomed, well-dressed, and well-shaven. Tr. at 377, 381, 399, 421, 424, 427, 430, 433, 436, 437, 442, 445, 446, 449, 452, 456, D.E. 13. Additionally, providers noted that Merritt enjoyed cooking a number of different dishes (*id.* at 377, 436, 445, 449), enjoyed smoking cigars with friends at a cigar shop (*id.* at 441), and made himself spend time outside of his home (*id.* at 423). Providers also opined that Merritt had normal concentration (*id.* at 399, 401, 404, 421, 424, 427, 430, 433), and there is no evidence to suggest that Merritt experienced repeated episodes decompensation which lasted for an extended period. Therefore, ALJ Seery did not err by concluding that Merritt did not meet the paragraph "B" criteria for Listings 12.04 and 12.06.

### b. Paragraph "C" Criteria

Although Listings 12.04 and 12.06 have the same paragraph "B" criteria, they have different paragraph "C" criteria. In order to meet the paragraph "C" criteria for Listing 12.04, the claimant must have a "[m]edically documented history of a chronic affective disorder of at least

[two] years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support," along with either (1) repeated episodes of decompensation, each of extended duration; (2) a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or (3) current history of one or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement. 20 C.F.R. Part 404, Subpt. P, App. 1, § 12.04. In order to meet the paragraph "C" criteria for Listing 12.06, the claimant must be completely unable to function independently outside of his home. *Id.* § 12.06.

    ALJ Seery concluded that Merritt did not the paragraph "C" criteria for either Listing. Tr. at 18, D.E. 12. This conclusion is supported by substantial evidence in the record. As already explained, there is no evidence showing that Merritt experienced repeated episodes of decompensation, each of extended duration. Similarly, there is no evidence showing that Merritt is incapable of functioning outside of his home, that he requires a highly supportive living arrangement, or that he has a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause him to decompensate. In fact, as ALJ Seery noted, Merritt is capable of caring for his own needs, enjoys cooking, and enjoys spending time with his friends outside of his home. *Id.*; *see, e.g.*, Tr. at 377, 423, 436, 441, D.E. 13. Accordingly, ALJ Seery did not err when he concluded that Merritt did not meet or medically equal Listing 12.04 and Listing 12.06.

## E. RFC Determination

Merritt next argues that ALJ Seery erred by finding that he is capable of performing a reduced range of medium work. Colvin contends that substantial evidence supports ALJ Seery's decision and that his decision should be affirmed. After review, the court determines that ALJ Seery's RFC analysis precludes meaningful review and should be remanded for further consideration.

If the claimant's impairment does not meet or equal a listed impairment under 20 C.F.R. Part 404, Subpart P, App. 1, then the ALJ must calculate the claimant's RFC to determine whether he can perform his past work despite his impairments. The claimant's RFC is comprised of his impairments and any related symptoms that affect his abilities in a work setting. 20 C.F.R. § 404.1545(a)(1). When assessing the RFC, the ALJ considers physical abilities; mental abilities; other abilities affected by impairments, such as "impairment(s) which impose environmental restrictions;" and the total limiting effects of the impairments and any related symptoms. *Id.* § 404.1545(b)–(d). The ALJ considers all impairments, even those that are not severe, "and reviews 'all of the relevant medical and other evidence.'" *Bryant v. Colvin*, 571 F. App'x 186, 190 (4th Cir. 2014) (quoting 20 C.F.R. § 404.1545(a)).

The ALJ must provide "findings and determinations sufficiently articulated to permit meaningful judicial review." *DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983); *see also Wyatt v. Bowen*, 887 F.2d 1082, 1989 WL 117940, at *4 (4th Cir. 1989) (per curiam). The ALJ's RFC determination "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g. daily activities, observations)." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (quoting Social Security Ruling 96-8p). Furthermore, "[t]he record should include a

12

discussion of which evidence the ALJ found credible and why, and specific application of the pertinent legal requirements to the record evidence." *Radford v. Colvin*, 734 F.3d 288, 295 (4th Cir. 2013). Fourth Circuit precedent "makes it clear that it is not [the court's] role to speculate as to how the ALJ applied the law to [her] findings or to hypothesize the ALJ's justifications that would perhaps find support in the record. *Fox v. Colvin*, 632 F. App'x 750, 755 (4th Cir. 2015).

Recently, the Fourth Circuit Court of Appeals held that an ALJ's opinion "lack[ed] the specific analysis that would allow for meaningful review," in part because the ALJ gave conclusory explanations for the weight assigned to medical opinion evidence. *Monroe v. Colvin*, __ F.3d __, 2016 WL 3349355, at *11–12 (4th Cir. 2016). In *Monroe*, the ALJ assigned medical opinion evidence differing weights because the opinions were either consistent or inconsistent with "the objective record," "the claimant's treatment history," the "other opinions of record," or the assigned RFC. *Id.* at *11. The Fourth Circuit Court of Appeals, explaining that the ALJ did not specify the evidence to which he was referring, determined that the ALJ failed to "'include a narrative discussion describing how the evidence supports each conclusion.'" *Id.* (quoting *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015)). Accordingly, the court held that "[w]ithout more specific explanation of the ALJ's reasons for the differing weights he assigned various medical opinions, neither we nor the district court can undertake meaningful substantial-evidence review." *Id.*

Here, ALJ Seery assigned little weight to a State agency medical consultant's opinion that Merritt could perform light work but failed to explain how the evidence supported his conclusion. Instead, ALJ Seery stated that he assigned little weight to the opinion because he "believes that claimant is capable of greater than light work." Tr. at 23, D.E. 12. This inadequacy

13

"frustrates meaningful review" and warrants remand. *Mascio*, 780 F.3d at 636; *see also Monroe*, 2016 WL 3349355, at *11–12.

### F. Certified Nurse Practitioner's Psychiatric Review Technique

Merritt also argues that ALJ Seery erred by not assigning controlling weight to a Psychiatric Review Technique completed by Elizabeth Hutchins, Merritt's treating certified nurse practitioner. Colvin argues that ALJ Seery properly evaluated the opinion. The court finds that ALJ Seery's analysis again precludes meaningful review.

Regardless of the source, the ALJ must evaluate every medical opinion received. 20 C.F.R. § 404.1527(c). When evaluating medical opinions, the ALJ should consider "(1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." *Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005) (per curiam). An ALJ's determination of the weight assigned to a medical opinion generally will not be disturbed absent some indication that the ALJ has dredged up "specious inconsistencies," *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992), or has failed to give a sufficient reason for the weight afforded a particular opinion, *see* 20 C.F.R. § 404.1527(d) (1998).

According to 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2), a treating source's opinion on issues of the nature and severity of the impairments will be given controlling weight when well supported by medically acceptable clinical and laboratory diagnostic techniques and when the opinion is consistent with the other substantial evidence in the record. Conversely, however, "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001); *see*

14

*also Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1994) (finding that "if a physician's opinion in not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight"). A medical expert's opinion as to whether one is disabled is not dispositive; opinions as to disability are reserved for the ALJ and for the ALJ alone. *See* 20 C.F.R. § 404.1527(e)(1) (1998). Generally, the more the medical source presents relevant evidence to support his opinion, and the better that he explains it, the more weight his opinion is given. *See* 20 C.F.R. § 404.1527(d)(3) (1998). Additionally, the more consistent the opinion is with the record as a whole, the more weight the ALJ will give to it. *See* 20 C.F.R. § 404.1527(d)(4) (1998).

Merritt argues that ALJ Seery erred by failing to assign the Psychiatric Review Technique completed by Elizabeth Hutchins, his treating certified nurse practitioner, controlling weight. Only the opinions of treating sources from the claimant's physician, psychologist, or other acceptable medical source may be entitled to controlling weight. *See Turner v. Astrue*, No. 3:12CV422-MOC-DSC, 2013 WL 1182681, at *3 (W.D.N.C. Feb. 12, 2013), *adopted by sub nom. Turner v. Colvin*, No. 3:12-CV-00422-MOC, 2013 WL 1181603 (W.D.N.C. Mar. 21, 2013); SSR 06-03P, 2006 WL 2329939, at *2; 20 C.F.R. §§ 404.1502, 404.1513(a), (c). A certified nurse practitioner is not an acceptable medical source under the regulations. *See* 20 C.F.R. § 404.1513(a) (listing acceptable sources who can provide evidence to establish an impairment as licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists); *id.* § 404.1513(d) (stating that other sources, such as nurse practitioners, may provide evidence to show impairment severity and how the impairment affects the claimant's ability to work). Thus, a certified nurse practitioner's opinion is not entitled to controlling weight. *See White v. Colvin*, No. 5:13-CV-

15

00757-RN, 2015 WL 1438747, at *11 (E.D.N.C. Mar. 27, 2015). However, the ALJ must still evaluate the opinion and explain the weight given to it. *See* 20 C.F.R. § 404.1527(c).

Here, ALJ Seery explained that he assigned little weight to Elizabeth Hutchins's Psychiatric Review Technique because she is not an acceptable medical source and because the limitations "attributed to the claimant are not consistent with the medical evidence of record with no evidence to substantiate such severe limitations." Tr. at 22, D.E. 12. This analysis is incomplete because ALJ Seery does not specify the "medical evidence of record" to which he was referring. *See Monroe v. Colvin*, __ F.3d __, 2016 WL 3349355, at *11 (4th Cir. 2016) (finding that an ALJ's analysis of a medical opinion precluded meaningful review when the ALJ explained that the opinion was entitled to limited weight because "the objective evidence or the claimant's treatment history did not support the consultative examiner's finding"). Accordingly, ALJ Seery's analysis precludes meaningful review and warrants remand.

### III. Conclusion

For the forgoing reasons, the court recommends that Merritt's Motion for Judgment on the Pleadings (D.E. 15) be granted, that Colvin's Motion for Judgment on the Pleadings (D.E. 17) be denied, and that the Commissioner's final decision be reversed and remanded.

Furthermore, the court directs that the Clerk of Court serve a copy of this Memorandum and Recommendation on each of the parties or, if represented, their counsel. Each party shall have until 14 days after service of the Memorandum and Recommendation on the party to file written objections to the Memorandum and Recommendation. The presiding district judge must conduct his or her own review (that is, make a *de novo* determination) of those portions of the Memorandum and Recommendation to which objection is properly made and may accept, reject, or modify the determinations in the Memorandum and Recommendation; receive further

evidence; or return the matter to the magistrate judge with instructions. *See, e.g.*, 28 U.S.C. § 636(b)(l); Fed. R. Civ. P. 72(b)(3); Local Civ. R. 1.1 (permitting modification of deadlines specified in local rules), 72.4(b), E.D.N.C.

**If a party does not file written objections to the Memorandum and Recommendation by the foregoing deadline, the party will be giving up the right to review of the Memorandum and Recommendation by the presiding district judge as described above, and the presiding district judge may enter an order or judgment based on the Memorandum and Recommendation without such review. In addition, the party's failure to file written objections by the foregoing deadline will bar the party from appealing to the Court of Appeals from an order or judgment of the presiding district judge based on the Memorandum and Recommendation.** *See Wright v. Collins*, **766 F.2d 841, 846–47 (4th Cir. 1985).**

Dated: January 3, 2017.

_____
ROBERT T. NUMBERS, II
UNITED STATES MAGISTRATE JUDGE